UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICOLE BELLOTTIE,

Plaintiff,

v.

HEALTHCAREFIRST, INC.,

Defendant.

Case No. 2:24-cv-12325
Hon. Gershwin A. Drain

________________________________/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF No. 21]**

Plaintiff Nicole Bellottie alleges that her former employer, Defendant Healthcarefirst, Inc., interfered with her Family and Medical Leave Act ("FMLA") rights, retaliated against her for exercising her FMLA rights, and discriminated against her because of her disability in violation of the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"). Defendant filed a Motion for Summary Judgment on all claims.

The Motion for Summary Judgment is fully briefed. The Court concludes that a hearing will not aid in the disposition of this motion and will determine the outcome on the briefs. E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, Defendant's Motion for Summary Judgment [ECF No. 21] is GRANTED.

# I. BACKGROUND

## A. Defendant's Business and Operation

Defendant Healthcarefirst, Inc. is a company that provides software solutions and other services to home health and hospice care agencies. ECF No. 21-2, PageID.107. Part of Defendant's business is "Clinical Documentation and Review," which involves performing medical billing, medical chart review, and coding services for clients to ensure that they are in regulatory compliance and to optimize their financial performance. *Id.* at PageID.107–08. The Clinical Documentation and Review team is further split into two sub-teams: one team focused on MatrixCare Electronic Medical Record ("EMR") clients, and one team focused on Non-MatrixCare EMR clients. *Id.* at PageID.108.

The Non-MatrixCare EMR team is further subdivided into two groups. One is a group of coders ("Coders") who perform medical coding services and who are supervised by Ms. Patricia Weber. *Id.* at PageID.108. The other is a group of Outcome and Assessment Information Set ("OASIS") and 485 review specialists ("Review Specialists"). The Review Specialists review patient charts for proper assessments and plans of care, ensure accuracy and completeness, identify discrepancies and errors, and make corrections. *Id.* This team is supervised by Ms. Tressa Hronek. *Id.* At the time of the events in this case, both Ms. Weber and Ms. Hronek reported to Mr. Jeremy Crow, the then-Director of Revenue Cycle Services

and Senior Director of Revenue Cycle Management and Survey Operations. *Id.* at PageID.107–08.

Review Specialists are assigned patient charts to review and a weekly productivity target to ensure timely completion of the review process. ECF No. 21-2, PageID.109. According to Mr. Crow, timely review "is essential" because Defendant's clients must have finalized reviews before they can be paid from federal payers, and because Defendant is paid on a per-chart basis (i.e., Defendant does not get paid for reviews that are not completed). *Id.*

To monitor productivity, Defendant assigns a numerical value (called "points") to each task that a Review Specialist is required to perform. ECF No. 21-6, PageID.155; ECF No. 21-3, PageID.121. The values for each task are added up on a weekly basis. As of 2022, Defendant required Review Specialists to complete 40 points each week. ECF No. 21-6, PageID.155; ECF No. 21-3, PageID.121. If the employee took PTO or other leave, or otherwise did not work 40 hours per week, the number of points they were required to complete each week was reduced pro rata. ECF No. 21-4, PageID.142.

**B. <u>Plaintiff's Employment and Health Challenges</u>**

In 2018, Plaintiff was hired by Defendant to join the Review Specialist team on the Non-MatrixCare EMR team in the Clinical Documentation and Review line of business. ECF No. 21-3, PageID.118; ECF No. 21-5, PageID.152.

Plaintiff has struggled with depression and anxiety for "most of [her] life." ECF No. 23-2, PageID.336.[1] Beginning in 2020, personal circumstances in Plaintiff's family life began contributing to the worsening of her mental health. Specifically, in 2020, her husband Bryan began exhibiting symptoms of Huntington's disease. *Id.* In 2021, Bryan's physician informed Plaintiff and Bryan that there was a "high degree of certainty" that Bryan had the disease. *Id.* Because Huntington's disease is hereditary, each of Plaintiff's two children have a 50% chance of developing it. *Id.* In 2022, Plaintiff's adult son, Brandon, lost his job and his partner broke up with him, causing him to have to move home with his parents. *Id.* Brandon was depressed and not coping well. *Id.* Around the same time, Bryan's Huntington's symptoms began worsening. *Id.* Plaintiff stated that, at this point, she was "very worried about [her] ability to care for [her] family," and her anxiety and depression increased. *Id.*

In April 2022, Plaintiff emailed Ms. Hronek, her supervisor, to see if she could reduce her schedule to 32 hours per week because she "had a lot going on right now and it would be helpful." ECF No. 21-3, PageID.122. Plaintiff did not explain what was going on in her life. *Id.* There is no evidence that Ms. Hronek ever responded to this email. *Id.* Although Ms. Hronek did not respond, Plaintiff did not follow up with

---

[1] Plaintiff states that her lifelong depression and anxiety were exacerbated when her stepfather committed suicide in 2007 and her mother committed suicide in 2010. ECF No. 23-2, PageID.336.

her or anyone else about a request for reduced hours, although she told a team leader that she had emailed Ms. Hronek. *Id.*

On October 26, 2022, Ms. Hronek emailed Plaintiff regarding her productivity. She indicated that Plaintiff had failed to meet the 40-point productivity threshold for all of September 2022 and for the first three weeks of October. ECF No. 21-7, PageID.162. In her response, Plaintiff stated that she was not sure whether she would always be able to obtain 40 points per week but that she did not want to put her job in jeopardy. *Id.* at PageID.161. She asked whether she could possibly reduce her hours so that her required productivity could be lower. *Id.*

Ms. Hronek did not answer that question in her following email, but simply told Plaintiff how she should be tracking her productivity and reiterated that Plaintiff was expected to get 40 points per week. *Id.* at PageD.160. In Plaintiff's next email, she expressed her disappointment that she was falling so behind. *Id.* at PageID.159.[2] Plaintiff was concerned about the number of hours it takes her to complete 40 points per week and again asked whether she could decrease her hours or salary so that she

[2] In Plaintiff's email, she explained that the drop in productivity was a result of Defendant increasing the expected productivity target and workload for each Review Specialist by 20%. She told Ms. Hronek that she was "disappointed and saddened that what would have been considered as going above and beyond this time last year, despite [her] efforts, is considered falling short at this time." ECF No. 21-7, PageID.159.

would not be at risk of falling short by 2–3 points every week. *Id.* Ms. Hronek asked Plaintiff to discuss the matter with her over a call. *Id.* at PageID.158.

Plaintiff testified that in this call, she "expressed to [Ms. Hronek] what was going on, that I was dealing with anxiety and depression and my husband's issues and that it's difficult for me to concentrate." ECF No. 21-3, PageID.124. Plaintiff stated that she cried on the phone call and explained that her job was of utmost importance to her because she needed it to take care of her family. *Id.* Plaintiff further testified that Ms. Hronek told Plaintiff that she would talk to Mr. Crow about decreasing her hours. *Id.* However, nothing came of the conversation, and Plaintiff's hours were not reduced. *Id.* Ms. Hronek testified that she did not recall Plaintiff ever telling her about her depression or family situation, and stated that she did not recall Plaintiff asking for a reduction in hours at this time. ECF No. 21-4, PageID.147, ECF No. 23-6, PageID.398–99.

In May of 2023, Plaintiff had a regularly scheduled phone check-in with Ms. Hronek. In the phone call, Plaintiff talked to Ms. Hronek about how she was struggling with her family's problems and her own anxiety and depression, stating that "I was either going to need to reduce my hours or take an FMLA, that I was essentially in a hamster wheel… struggling to keep up." ECF No. 21-3, PageID.127–128. Ms. Hronek testified that she did not remember Plaintiff mentioning anxiety and depression. ECF No. 21-4, PageID.147. However, given that Plaintiff had

indicated that she was struggling, Ms. Hronek referred Plaintiff to the Employee Assistance Program ("EAP") for counseling and advice. Plaintiff did reach out to the EAP, but they informed her that her issues were beyond the scope of their ability to help. ECF No. 21-3, PageID.127.

On June 26, 2023, Ms. Hronek reached out to Human Resources, stating that Plaintiff was requesting to have her hours lowered due to responsibilities outside of work.[3] Ms. Hronek stated that she was "not sure this would classify as FMLA or medical leave time," but asked HR to discuss Plaintiff's options with her. ECF No. 21-10, PageID.171. HR reached out to Plaintiff on June 29, 2026, asking her to clarify what her desired accommodation was. ECF No. 21-11, PageID.175. Plaintiff explained that "I have requested a decrease in hours so that my productivity can decrease… I am unable to meet the expected productivity in a 40-hour work week." *Id.* Further, she stated that "I have family health issues that need my time and attention." *Id.*

In early July 2023, Plaintiff had a phone call with a Human Resources employee, Ms. Lori Swinehart, in which they discussed "how FMLA works" and "how reducing [Plaintiff's] hours would work." ECF No. 21-3, PageID.130. Plaintiff

[3] Plaintiff testified that Ms. Hronek only reached out to HR to inquire about a reduction in hours/leave after Plaintiff went around her to Defendant's quality auditor, Satia Devane, about the struggles she was experiencing. ECF No. 21-3, PageID.128.

informed Ms. Swinehart about her husband's Huntington's disease and her own anxiety and depression. *Id.* Plaintiff testified that the conversation was about weighing her options—she wanted to reduce her hours to focus more on her family, but hoped to be able to go back up to 40 hours because her husband would eventually be unable to work due to his disease. *Id.* Ms. Swinehart stated that the decision to reduce her hours was not one that HR could make, but that Plaintiff should try to support her request for reduced hours with a doctor's note. Ms. Swinehart also informed her about how to request FMLA. *Id.* Plaintiff testified that she had no other conversations with her supervisors or anyone else at Healthcarefirst about reducing her hours or taking leave until October 12, 2023, when she officially asked for FMLA leave. *Id.* at PageID.131.[4]

Plaintiff met with her physician on September 28, 2023, who wrote a letter on behalf of Plaintiff in support of a "stress leave of absence" from October 11, 2023 to November 10, 2023, pending improvement. ECF No. 21-17. Plaintiff did not turn in this note or request until October 12, 2023 because she "was still trying to push through." ECF No. 21-3, PageID.132. However, Plaintiff stated that on October 11, 2023, she had a "mental breakdown" and realized she was "spiraling bad," which

[4] Plaintiff testified that she may have informed her coworker, Amy Heupp, about the struggles she was facing, but only in a "friendly" capacity. ECF No. 21-2, PageID.131.

prompted her to make her FMLA request official. *Id.* Ms. Swinehart from HR approved Plaintiff to begin her FMLA leave. ECF No. 21-16, PageID.247.

**C. Defendant's Reduction in Force ("RIF")**

Mr. Crow testified that from the time he began his employment at Healthcarefirst in 2020, it had been operating at a loss in its Clinical Documentation and Review line of business. ECF No. 21-2, PageID.109–10. Concurrently, Defendant began outsourcing its coding and review work to contractors in India and the Philippines to cut costs. *Id.* at PageID.110. As of August 2023, Defendant "determined that a company-wide reduction-in-force (RIF) needed to occur because of ongoing economic headwinds, including declining federal government healthcare reimbursement rates and increased operational costs." *Id.* As a result, "all lines of business[,]… including Clinical Documentation and Review, were directed to reduce staff by certain dollar amounts that were then equated to headcounts." *Id.* Clinical Documentation and Review was directed to reduce the headcount by eight positions. *Id.*

Mr. Crow, along with Ms. Weber of the Coding team and Ms. Hronek of the Review Specialist team, concluded that each team would cut four positions. *Id.* at PageID.110–11. To determine who to lay off, Ms. Hronek reviewed productivity reports from the previous four months (May 2023 to August 2023) and calculated how many weeks each Review Specialist had missed the 40-point productivity

target. ECF No. 21-4, PageID.142. Ms. Hronek identified Jennifer Piper, Claire Timmins, and Plaintiff as the lowest performers based on her tally, and therefore selected them as the individuals who were to be laid off. *Id.* at PageID.143; ECF No. 21-13. In August 2023, after Defendant had decided to reduce its workforce but before any decisions were made about who to let go, a Review Specialist named Nicole Rachal voluntarily resigned. ECF No. 21-2, PageID.111. Ms. Hronek decided to include her resignation to meet the RIF quota of four individuals. *Id.* Notably, of the individuals who were chosen to be laid off, Claire Timmins had not ever taken FMLA leave. *Id.* After Ms. Timmins had been selected to be laid off, but before she was informed about it, she voluntarily resigned on September 15, 2023. ECF No. 21-13, PageID.192. Her voluntary resignation was still used to meet the four-headcount RIF quota.

Ms. Weber, from the Coding team, also identified four Coders who were to be let go. ECF No. 21-2, PageID.111. None of the Coders had ever taken FMLA leave. *Id.*

At the end of October 2023—at which time Plaintiff was on her FMLA leave—Defendant implemented the RIF and informed the affected employees. ECF No. 21-12, PageID.182. Over 100 employees across the company were let go. ECF No. 21-2, PageID.113. Mr. Crow and HR called Plaintiff to inform her that she had been let go in the RIF. Plaintiff was "devastated." ECF No. 23-3, PageID.345–46.

Defendant kept Plaintiff on the payroll with benefits for her entire 12-week FMLA period, until January 5, 2024, when she was finally laid off. ECF No. 21-3, PageID.136.

On September 6, 2024, Plaintiff filed the instant lawsuit against Defendant, alleging that Defendant discriminated against her for her disability (anxiety and depression) under the PWDCRA; retaliated against her for exercising her rights under the FMLA; and interfered with her right to reinstatement under the FMLA. *See* ECF No. 1.

Defendant filed a Motion for Summary Judgment. ECF No. 21. Defendant argues that there is no evidence that Defendant interfered with Plaintiff's FMLA right to reinstatement, retaliated against Plaintiff for using FMLA, or discriminated against Plaintiff for her anxiety and depression. Defendant claims that it had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment, and that Plaintiff cannot prove that this reason was pretextual. Plaintiff opposes Defendant's motion.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion" by identifying portions of the record that demonstrate an absence of a material dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a "properly supported motion for summary judgment is made," the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The court must construe all reasonable inferences in favor of the nonmoving party when conducting its analysis. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It "may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment; only the finder of fact can make such determinations." *Doe v. Snyder*, 449 F. Supp. 3d 719, 727 (E.D. Mich. 2020). However, a party supporting or opposing a motion for summary judgment must use evidence that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

## III. DISCUSSION

### A. FMLA

"The FMLA entitles qualifying employees up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506 (6th Cir. 2006) (quoting

*Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)). An employee who takes FMLA leave is also entitled to "return to… an equivalent job after using protected leave." *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 865 (6th Cir. 2023) (quoting *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001)).

"It is unlawful 'for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA].'" *Walton*, 424 F.3d at 485 (quoting 29 U.S.C. § 2615(a)(1)). An employer who does so is liable to the employee for damages and appropriate equitable relief. *Id.* There are two theories under which a plaintiff-employee may recover against her employer for FMLA violations. *See* 29 U.S.C. § 2615(a). "The first, known as an entitlement or interference claim, arises when an employee is wrongfully denied a substantive entitlement—for example, the employee is denied leave to which she is entitled." *Milman*, 58 F.4th at 866 (quoting *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238, 244 (6th Cir. 2004)). "In this type of claim, 'the plaintiff need not show that he was treated worse than other employees, just that he was denied an entitlement under the Act.'" *Id.* The second, "known as a retaliation or discrimination claim, arises when an employer takes an adverse employment action against the employee for exercising or attempting to exercise a right protected by the FMLA." *Id.* (citing *Bryant v. Dollar Gen. Corp.*, 538 F.3d 394, 400–02 (6th Cir. 2008)).

"Where a plaintiff relies on indirect evidence, claims of FMLA interference and retaliation are subject to the same tripartite burden-shifting framework under *McDonnell Douglas*[.]" *Garavaglia v. George P. Johnson Project: Worldwide, Inc.*, No. 20-cv-12714, 2023 WL 3826456, at *10 (E.D. Mich. June 5, 2023) (citing *Donald v. Sybra*, 667 F.3d 757, 762 (6th Cir. 2012); *Render v. FCA US, LLC*, 53 F.4th 905, 919 (6th Cir. 2022)).[5] Once an employee offers sufficient evidence to support her prima facie case for interference or retaliation, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *Id.* If the employer does so, "the plaintiff bears the ultimate burden of production to demonstrate pretext." *Id*.

### 1. Interference

[5] As noted by the Sixth Circuit, there has been "some confusion over when *McDonnell Douglas* applies to interference claims." *Render*, 53 F.4th at 919. But the Sixth Circuit has since made clear that *McDonnell Douglas* will apply to interference claims whenever the employee relies on *circumstantial evidence* to prove the claim. *Id.* For example, when an interference claim is based on the employer terminating the employee, the *McDonnell Douglas* burden-shifting framework typically applies because "employers can terminate employees for many reasons—only some of which amount to FMLA interference." *Id.* In contrast, the *McDonnell Douglas* framework will not apply to direct evidence of interference, such as when the employer outright denies leave to which the employee is entitled. *Id.* In this case, Plaintiff claims that she was terminated and that, by terminating her, Defendant interfered to her right to reinstatement under the FMLA. ECF No. 23, PageID.325. Because Defendant could have terminated her for valid reasons, the termination is only circumstantial evidence of interference, and the burden-shifting framework applies.

Defendant argues that there is no evidence that Defendant interfered with Plaintiff's FMLA rights. Defendant asserts that it was only obligated to reinstate Plaintiff to the position she would have been in if she had not taken leave, and since she would have been let go in the RIF regardless of her leave, she was not entitled to be reinstated. *Id.* at PageID.89–90.

In response, Plaintiff argues that she has stated a prima facie case for FMLA interference because she was not reinstated to her job (or an equivalent job) at the end of her leave. ECF No. 23, PageID.325.[6] She further argues that Defendant's reasons for terminating her employment were pretextual. *Id.* at PageID.325–26. She relies on several arguments to support this contention. First, she claims that Ms.

[6] In Plaintiff's response brief, she also raises for the first time an argument that Defendant interfered with her FMLA rights by failing to respond appropriately or engage in an "interactive process" with her when she inquired about reducing her hours and taking leave. ECF No. 23, PageID.327. However, Plaintiff did not advance this legal theory for FMLA interference in her complaint. Rather, the complaint's FMLA interference claim is solely based on failure to reinstate her after her leave ended. *See* ECF No. 1, PageID.6. The Court will not consider Plaintiff's new theory because "[i]t is well-settled that a plaintiff may not expand [her] claims to assert new theories in response to summary judgment…" *Vonderhaar v. Waymire*, 797 F. App'x 981, 990 (6th Cir. 2020) (refusing to consider new FMLA interference theories raised for the first time in response to summary judgment). In any event, "the FMLA is not a strict-liability statute." *Coker v. McFaul*, 247 F. App'x 609, 617 (6th Cir. 2007). Employees that seek relief for FMLA interference must show that the employer's violation caused them actual harm. *Id.* Even if Defendant failed to engage in the "interactive process" required under the FMLA when Plaintiff inquired about leave, Plaintiff has proffered no evidence or argument showing how that specific failure caused her harm. It is undisputed that Plaintiff ultimately received all the FMLA leave she was entitled to.

Hronek's "tally" of the Review Specialists who had the lowest productivity was based on so-called "voodoo statistics," because if Ms. Hronek averaged the weekly points for each Review Specialist, Plaintiff's productivity would be fourth best out of 13 reviewers. *Id.* at PageID.322–24.[7] She further notes that her charting accuracy was typically excellent. *Id.* at PageID.326. Additionally, Plaintiff claims that Ms. Hronek only selected individuals who had taken FMLA leave for the RIF, ECF No. 23, PageID.324, and that Defendant continued hiring for Plaintiff's position after the RIF. *Id.* Plaintiff asserts that Defendant's "mendacity" is evidence of pretext. *Id.* at PageID.322, 325. She also points to the temporal proximity of her inquiries about FMLA (in May through July 2023) and her selection to be included in the RIF in September 2023. ECF No. 23, PageID.324.

*i.* *<u>Prima Facie Case</u>*

To state a prima facie case for FMLA interference, Plaintiff must prove that (1) she was an eligible employee, (2) Defendant is an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave Defendant notice

[7] Plaintiff's evidence that she ranked fourth best is a chart made by an unknown person which adds up and averages the productivity points of all 13 Review Specialists over a 17-week period. *See* ECF No. 23-5. The chart is not a document that Defendant created or relied on in making any decisions. ECF No. 27, PageID.444 n.5. Plaintiff states that the chart is based on the productivity reports that Ms. Hronek used to tally the weeks each Review Specialist missed their target. ECF No. 23-2, PageID.336–37. Defendant did produce the productivity reports relied on by Ms. Hronek. *See* ECF No. 21-15.

of her intention to take leave, and (5) Defendant denied her the FMLA benefits to which she was entitled. *Edgar*, 443 F.3d at 507. Defendant does not dispute that Plaintiff satisfied any of these elements except for (5)—that Plaintiff was entitled to the FMLA benefit of being reinstated at the end of her leave. ECF No. 21, PageID.89–91. Defendant argues that it validly included Plaintiff in the RIF and therefore had a legitimate reason for not reinstating her. *See id.* However, because the *McDonnell Douglas* framework applies here, Defendant's argument pertains to its legitimate, nondiscriminatory reason for failing to reinstate Plaintiff and does not affect her prima facie case. *See Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (stating that an FMLA plaintiff need only make a "low threshold showing… to survive the prima facie stage of proof."). It is undisputed that Plaintiff was not reinstated after her FMLA leave. Because reinstatement is an entitlement under the FMLA, Plaintiff has stated a prima facie case for interference. *Milman*, 58 F.4th at 865.

*ii. <u>Legitimate, Nondiscriminatory Reason</u>*

The burden now shifts to Defendant to demonstrate a legitimate, nondiscriminatory reason for failing to reinstate Plaintiff. Defendant adequately satisfies this burden. It is well established that "[a]n employee who requests FMLA leave… ha[s] no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before

submitting that request." *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (quoting *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998)). Thus, "[a]n employee lawfully may be dismissed, preventing [her] from exercising [her] statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Id.*; *see also Hoge*, 384 F.3d 238, 245 (6th Cir. 2004) ("[A]n employer need not restore an employee who would have lost his job or been laid off even if he had not taken FMLA leave.").

Here, Defendant has provided evidence that it was operating at an increasing loss in its Clinical Documentation and Review line of business from at least 2020. ECF No. 21-2, PageID.109–10. The evidence also establishes that all of Defendant's lines of business were ordered to reduce their headcount by over 100 employees in total, and in the Clinical Documentation and Review line of business specifically, the team was instructed to eliminate eight positions. *Id.* at PageID.110. Defendant also provided evidence of the productivity reports Ms. Hronek relied upon to select the individuals to include in the RIF, and evidence that Plaintiff was selected because of her number of missed productivity targets. *Id.*; ECF No. 21-13, PageID.191; ECF No. 21-15. Defendant's RIF is a legitimate, nondiscriminatory reason for not reinstating Plaintiff. *See Madry v. Gibraltar Nat'l Corp.*, 526 F. App'x 593, 596 (6th Cir. 2013) (finding layoffs caused by an economic downturn a legitimate,

nondiscriminatory reason for not reinstating the plaintiff at the end of her FMLA leave); *Garavaglia*, 2023 WL 3826456, at *11 ("Defendants have advanced the company-wide reduction in force as a legitimate reason to discharge Plaintiff[.]").

*iii.* *Pretext*

Now the burden shifts back to Plaintiff to establish that Defendant's legitimate, nondiscriminatory reason is pretext. An employer's reason is pretextual if it is shown to be false and that discrimination is the real reason. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Id.* A court must "avoid formalism" in the application of this test for pretext. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). At bottom, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.*

"At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Id.* "[A]n employer [is] entitled to judgment as a matter of law if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and

uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

Plaintiff offers several arguments as to why Defendant's legitimate reason (the RIF) was pretextual. First, she argues that by averaging the productivity points of each Review Specialist over the four-month period Ms. Hronek considered, Plaintiff ranked fourth in productivity out of 13 reviewers in the same period. ECF No. 23, PageID.317. Importantly, however, Plaintiff does not contest that when simply tallying the number of times each reviewer missed their weekly productivity target over the same period—the method that Ms. Hronek used to determine who to cut—she was tied with her co-worker, Claire Timmins, for second lowest in productivity out of all 13 reviewers. *See* ECF No. 21-15 (Defendant's productivity reports); ECF No. 21-13, PageID.191.[8]

"In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an

[8] Plaintiff questions why Ms. Hronek's tally was not produced in discovery, claiming that the failure to produce the tally is "highly suspicious" and "fishy." ECF No. 23, PageID.323. But Defendant *did* produce the productivity reports on which Ms. Hronek based her tally. ECF No. 21-15. By reviewing the productivity reports, anyone can tally the number of times each Review Specialist missed their weekly productivity target. The lack of Ms. Hronek's tally in evidence makes no difference.

adverse employment action." *Madry*, 526 F. App'x at 598 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). "It is not within the province of the courts to… 'act as super personnel departments to second guess an employer's facially legitimate business decisions.'" *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 258 (6th Cir. 2011) (citation omitted). Here, "Plaintiff fails to offer any summary judgment evidence that the criteria used by Defendant[] in implementing the reduction in force… were inappropriate, and it is not the role of the Court to second-guess the business judgment of an employer." *Garavaglia*, 2023 WL 3826456, at *13.

Moreover, Plaintiff's calculation of the productivity average of each Review Specialist does not account for PTO or hours worked, further detracting from its evidentiary value. As Ms. Hronek explained in her deposition, a person's weekly productivity target was reduced for any time off they took "because obviously they wouldn't be producing if they were off; right?" ECF No. 21-4, PageID.142. Thus, Defendant gauged productivity relative to the actual hours a Review Specialist worked, not in total. *Id.* In Plaintiff's calculations, however, she simply added and averaged the productivity points of each Review Specialist regardless of the hours they worked.[9] Thus, as an example, Plaintiff's coworker Nancy Adair-Muder had a

---

[9] The only adjustment Plaintiff made was by not counting the weeks when Review Specialists had zero hours and zero productivity points. *See* ECF No. 23-5. However, not every week that a person took PTO would result in zero productivity points; if

very low average of 28.59 productivity points per week, putting her near the bottom of Plaintiff's list. ECF No. 23-5, PageID.381. However, Defendant's actual productivity reports demonstrate that Ms. Adair-Muder only worked 30 hours per week and was only expected to obtain 30 productivity points per week. *See* ECF No. 21-15, PageID.228. By simply averaging the productivity of each person without any further analysis of hours worked, Plaintiff's calculations disregard this distinction. Ms. Adair-Muder's average productivity for the period, per Plaintiff's own calculations, was only about 1.4 points off from her weekly target (as compared to Plaintiff's, which was about 4.2 points off from her weekly target). *See* ECF No. 23-5. At bottom, Defendant chose to track and gauge productivity relative to hours worked, and there is no reason for the Court to conclude that this method is erroneous or inappropriate. *See Madry*, 526 F. App'x at 598. Plaintiff has not offered any evidence to support such an argument, so Plaintiff's averages calculation is insufficient to demonstrate any pretext in that regard.

Second, Plaintiff argues that her chart reviews were highly accurate. ECF No. 23, PageID.326. Ms. Hronek testified that Plaintiff's accuracy was "usually always very good." ECF No. 23-6, PageID.393. Satia Devane, a quality auditor, also told Plaintiff that her accuracy scores were "really good." ECF No. 23-9, PageID.420.

---

that person worked for part of the week, they would have a productivity target and a productivity point score, but it would be less than 40.

But as Ms. Hronek further stated, many Review Specialists had "very high scores." ECF No. 23-6, PageID.393. Mr. Crow reiterated that point. ECF No. 21-12, PageID.185 ("[Q]uality concerns had not been brought to my attention for Nicole, but that's consistent with many of our employees. It's an exception rather than the rule. So [the focus is on] productivity primarily.").

In a RIF, "qualified employees are going to be discharged." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 896 (6th Cir. 1997); *see also Norbuta v. Loctite Corp.*, 1 F. App'x 305, 314 (6th Cir. 2001) ("When an employer implements a RIF, the unfortunate fact is that someone has to go."). Thus, Plaintiff's charting accuracy does not help her to establish pretext in this RIF scenario, particularly because there is no evidence in the record of anyone else's accuracy and quality. All the evidence establishes is that Plaintiff's quality was good, but that good quality was typical of Review Specialists. ECF No. 21-12, PageID.185. Although Plaintiff performed satisfactorily in this aspect of her job, Defendant chose to focus primarily on productivity to determine who to eliminate in the RIF. *Id.* "It is not the prerogative of the courts to engage in post-hoc management of the employer's internal affairs by second-guessing how personnel could have been more equitably allotted, or cost-savings better realized." *Norbuta*, 1 F. App'x at 314.

Third, Plaintiff argues that Ms. Hronek only selected individuals who had requested or taken FMLA leave for the RIF, which is evidence of pretext. ECF No.

23, PageID.324. But this assertion is contradicted by the evidence. Claire Timmins, one of the Review Specialists selected for the RIF, had never requested or taken FMLA leave. ECF No. 21-2, PageID.112.[10] Plaintiff seems to rely on the fact that Ms. Timmins resigned before the RIF was implemented to support her assertion that only Review Specialists who had utilized FMLA were chosen for the RIF. ECF No. 23, PageID.316. The unrebutted evidence shows, however, that Ms. Timmins was chosen to be in the RIF prior to her resignation. ECF No. 21-13, PageID.192; *see Johnson v. Evolent Health, LLC*, No. 22-5574, 2023 WL 2326676, at *8 (6th Cir. Mar. 2, 2023) (finding the plaintiff's pretext argument unavailing because "at least one other similarly situated employee was terminated without having requested FMLA leave."); *Partin v. Weltman Weinberg & Reis Co., LPA*, No. 1:14-cv-216, 2016 WL 67299, at *8 (S.D. Ohio Jan. 5, 2016) ("When positions are eliminated due to budget cuts, a defendant's inclusion of employees who have not taken FMLA leave is evidence that the defendant's selections for elimination were not pretextual.").

[10] It is unknown whether Nicole Rachal, one of the other Review Specialists selected for the RIF, had ever requested or taken FMLA leave. However, Ms. Rachal is in a different position than the other Review Specialists who were let go. Ms. Rachal had chosen to resign before any RIF termination decisions were made, and Ms. Hronek and Mr. Crow used her resignation to satisfy one of the eliminations they were required to make in the Clinical Documentation and Review Team. ECF No. 21-2, PageID.111–12.

In any event, all four of the individuals from the Coding team who were selected for the RIF had never utilized FMLA, and the RIF was company-wide, affected all lines of Defendant's business, and resulted in over 100 employees losing their jobs. ECF No. 21-2, PageID.110–11, 113; *see Partin*, 2016 WL 67299, at *9 ("When viewed in the context of a [firm]-wide RIF… plaintiff['s] evidence fails to cast doubt on defendant's stated reason for her termination."). Moreover, even if the Court "indulged [Plaintiff] and narrowed [its] focus" to the Review Specialist team of the Clinical Documentation and Review line of business (of which there were 13 reviewers), a 13-employee sample "provide[s] little or no probative force to show discrimination." *Partin v. Weltman Weinberg & Reis Co., LPA*, 666 F. App'x 428, 431 (6th Cir. 2016) (affirming grant of summary judgment on FMLA claim; noting that in a small team of employees, it is much more likely that chance is the controlling factor making it appear like employees who took FMLA were targeted in a RIF).

Fourth, Plaintiff claims that "Defendant hired employees for Plaintiff's position after the RIF." ECF No. 23, PageID.324. Plaintiff relies on undated screenshots of what appears to be job postings for Review Specialists on a professional networking platform, which she allegedly took after she was terminated. ECF No. 23-8, PageID.411. Plaintiff acknowledged, however, that she did not actually know whether Defendant hired anyone to replace her after the RIF.

ECF No. 23-4, PageID.375. The undisputed evidence shows that after Plaintiff's RIF, Defendant continued operating at a loss, conducted an additional RIF that caused the termination of another Review Specialist, and never filled the positions of two additional Review Specialists who resigned. ECF No. 21-2, PageID.113–14. There is no evidence that anyone was hired into Plaintiff's position (or any Review Specialist position) after the RIF.

Fifth, Plaintiff argues that Defendant's "mendacity" shows pretext. ECF No. 23, PageID.322, 325. Aside from Plaintiff's other arguments in support of pretext, which the Court has already rejected, Plaintiff claims that Defendant has been untruthful in this litigation by denying that it had notice of Plaintiff's FMLA requests until October 12, 2023. *Id.* at PageID.325. Mendacity, however, relates to "the falsity of an employer's *explanation*" for the adverse employment action. *Reeves*, 530 U.S. at 147 (emphasis added). Defendant's explanation for the adverse employment action is that Plaintiff was eliminated in the RIF. Plaintiff has offered no evidence that would contradict that proffered reason or show mendacity.

Sixth, Plaintiff argues that Defendant permitted Plaintiff's coworker, Nancy Adair-Muder, to work reduced hours, demonstrating disparate treatment. ECF No. 23, PageID.329.[11] "Comparator evidence can establish pretext." *Sharqawi v. Kirby*

[11] Plaintiff did not specifically raise this argument in relation to pretext—only in relation to causation in her FMLA retaliation claim and to accommodations in her PWDCRA claim. However, because this case is resolved on pretext, and because

*Co.*, 675 F. Supp. 3d 798, 826 (N.D. Ohio 2023). This type of evidence "consists of evidence that other employees, particularly employees not in the protected class, were not [subject to an adverse employment action] even though they engaged in substantially identical conduct[.]" *Smith v. Leggett*, 220 F.3d 752, 762 (6th Cir. 2000). To be sufficiently similarly situated to demonstrate pretext, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Sharqawi*, 675 F. Supp. 3d at 826 (quoting *Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 847–48 (6th Cir. 2015)).

As Defendant aptly points out, Ms. Adair-Muder cannot be used as a comparator here because there is no admissible evidence in the record about her. There is no evidence explaining why Ms. Adair-Muder had less hours, on what basis her hours were reduced, or whether she is otherwise a similarly situated comparator for Plaintiff's purposes in this lawsuit. ECF No. 27, PageID.441. Indeed, it is wholly possible that Ms. Adair-Muder received a reduction in hours pursuant to FMLA[12]—

similarly situated comparator evidence may be used to establish pretext, the Court addresses the issue here for completeness.

[12] The FMLA permits an employee to take leave in the form of a "reduced leave schedule," which reduces an employee's usual number of working hours per

meaning that she could be in the *same* protected class as Plaintiff, which would cut against Plaintiff's contention that the RIF was a subterfuge for FMLA discrimination. As Defendant states, "Plaintiff's assertion that Ms. [Adair]-Muder received more favorable treatment is mere conjecture—not evidence." *Id.*

Seventh and finally, Plaintiff argues that the temporal proximity between her July 2023 inquiries regarding FMLA leave and her selection for the RIF in September 2023 is highly probative of pretext. However, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald*, 667 F.3d at 762. Plaintiff's other evidence of pretext falls short, and the temporal proximity alone is insufficient to sustain Plaintiff's claim.

Therefore, Defendant is entitled to summary judgment on Plaintiff's claim for FMLA interference.

**2. Remaining Claims: FMLA Retaliation and PWDCRA Disability Discrimination**

As already noted, FMLA retaliation claims based on indirect evidence follow the *McDonnell Douglas* burden shifting framework. *Garavaglia*, 2023 WL 3826456, at *10. PWDCRA claims based on indirect evidence also follow that framework. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 567 (6th Cir. 2023).[13] In

---

workweek, or hours per workday. *Reeder v. Cnty. of Wayne*, 177 F. Supp. 3d 1059, 1074 n.11 (E.D. Mich. 2016) (citing 29 C.F.R. § 825.202).

[13] The PWDCRA provides that it is unlawful for an employer to "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the

other words, beyond establishing prima facie cases, both claims are predicated on (1) the employer proffering a legitimate, nondiscriminatory reason for the adverse employment action, and (2) the plaintiff proffering sufficient evidence that the reason is pretextual.

Having already determined that Defendant proffered a legitimate, nondiscriminatory reason for Plaintiff's discharge and that Plaintiff failed to rebut that reason as pretextual, Plaintiff's FMLA retaliation and PWDCRA disability discrimination claims may be dismissed on that basis without consideration of the prima facie stage of either claim. *See Selden Apartments v. U.S. Dep't of Hous. & Urb. Dev.*, 785 F.2d 152, 161 (6th Cir. 1986) (noting that where a defendant has done everything that would be required if the plaintiff had properly made out a prima facie case—i.e., proffered a legitimate, nondiscriminatory reason for the adverse employment action—"whether the plaintiff really did [state a prima facie case] is no

---

terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." Mich. Comp. Laws § 37.1202(1)(b). To state a prima facie case under the PWDCRA, a plaintiff must show that she (1) is disabled as defined in the act, (2) the disability is unrelated to her ability to perform her job duties, and (3) she has been discriminated against in one of the ways delineated in the statute. *Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004). If the plaintiff states a prima facie case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant does so, the plaintiff must demonstrate that the reason was pretextual. *Hrdlicka*, 63 F.4th at 567.

longer relevant."); *see also Blazek v. City of Lakewood*, 576 F. App'x 512, 516 (6th Cir. 2014) (assuming without deciding that the plaintiff stated a prima facie case for disability discrimination and instead finding that the plaintiff failed to demonstrate pretext); *Rutherford v. Country Fresh, L.L.C.*, No. 15-11700, 2016 WL 2998105, at *4 (E.D. Mich. May 25, 2016) (dismissing FMLA and PWDCRA claims due to lack of evidence of pretext, noting that mere temporal proximity alone is insufficient as a matter of law to show pretext for these claims).

As discussed above, after reviewing all the evidence, the Court concludes that Plaintiff has "created only a weak issue of fact as to whether [Defendant's] reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination ha[s] occurred." *Reeves*, 530 U.S. at 148. For this reason, Defendant is entitled to summary judgment on Plaintiff's FMLA retaliation and PWDCRA claims.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [ECF No. 21] is **GRANTED.** This case is **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**

Dated: September 1, 2026

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge